Artie MAHALEY et al., Plaintiffs-
Appellees,

v.

CUYAHOGA METROPOLITAN HOUS-
ING AUTHORITY et al., De-
fendants-Appellees,
and
City of Euclid et al., Defendants-
Appellants.

No. 73–1407.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1974.

Decided July 9, 1974.

Loyal V. Buescher, Charles T. Riehl, Cleveland, Ohio, for Municipal defendants-appellants; Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, on brief.

Andrew Boyko, Sol., City of Parma, and Robert R. Soltis, Sp. Counsel, Parma, Ohio, for defendants-appellants.

Schneider, Smeltz, Huston & Bissell by James I. Huston, Thomas J. LaFond, Cleveland, Ohio, on brief, for plaintiffs-appellees.

Walter C. Kelley, Fred J. Livingstone Michael L. Gordon Kelley, McCann & Livingstone, Cleveland, Ohio, on brief, for Cuyahoga Metropolitan Housing Authority.

Martin E. Sloane, Gen. Counsel, National Committee Against Discrimination In Housing, Inc., Washington, D. C., on brief, for Amicus Curiae.

Before WEICK, EDWARDS and PECK, Circuit Judges.

WEICK, Circuit Judge.

This appeal involves a controversy over low-rent housing under the United States Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq.

Plaintiffs are three Cleveland residents, who claim to be eligible for public housing, and an association interested in public housing, named The PATH. They filed an action in the District Court on March 15, 1971 against Cuyahoga Metropolitan Housing Authority (CMHA), a public housing agency, its Board and Executive Director, the municipalities of Euclid, Garfield Heights, Parma, Solon and Westlake (all suburbs of Cleveland) and their respective Mayors and councilmen, and the Department of Housing and Urban Development of the United States (HUD) and its Secretary, George Romney. Later the Court ordered that the case proceed as a class action.

The class alleged to be represented by the individual plaintiffs was "low income residents of the Greater Cleveland Ohio area, who by virtue of their poverty or race, or both, are unable to secure decent, safe and sanitary housing at rents which they can afford without the assistance of defendant CMHA." None of the three named individual plaintiffs resided in any of the five defendant municipalities. One of the individual plaintiffs, Mahaley, resides in a CMHA project in Cleveland.

Under the Act, before low-rent housing may be constructed in a given municipality there must be a local determination of need and "the governing body of the locality involved . . . [must have] entered into an agreement with the public housing agency providing for the local cooperation required by the Authority pursuant to this chapter . . . ."[1]

---

1. 42 U.S.C. § 1415(7) (a) (i), (ii), and (b) (i) provide:

(7) In recognition that there should be local determination of the need for low-rent housing to meet needs not being adequately met by private enterprise—

(a) The Authority shall not make any contract with a public housing agency for preliminary loans (all of which shall be repaid out of any moneys which become available to such agency for the development of the projects involved) for surveys and planning in respect to any low-rent housing projects initiated after March 1, 1949, (i) unless the governing body of the locality involved has by resolution approved the application of the public housing agency for such preliminary loan; and (ii) unless the public housing agency has demonstrated to the satisfaction of the Authority that there is a need for such low-rent housing which is not being met by private enterprise; and

(b) The Authority shall not make any contract for loans (other than preliminary loans) or for annual contributions pursuant to this chapter with respect to any low-rent housing project initiated after March 1, 1949, (i) unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation

In the first count of the complaint the plaintiffs attacked the constitutionality of the consent and cooperation agreement requirement of the Act.

Count two of the complaint alleged that the five municipalities had used the consent and cooperation agreement requirements of the Act as a means to exclude the plaintiffs and the classes they represent from living in these municipalities, in violation of their civil rights and of the Fourteenth Amendment to the Constitution of the United States.[2]

Plaintiffs prayed for an order directing CMHA to construct low-rent housing units in the five suburbs despite the consent requirement by the suburbs' governing bodies as provided in subsection (7)(a)(i) of the Act, and the cooperation agreement requirement of subsection (7)(b)(i) of the Act.

A three-Judge Court (Circuit Judge Celebrezze and District Judges Battisti and Lambros) was convened to consider the constitutional aspects of the case. There was a trial before the three-Judge Court and the case was submitted to it on the evidence which included stipulations, exhibits and depositions.

The three-Judge Court, in a signed Memorandum Opinion and Order stamped filed by the Clerk of the District Court on February 22, 1973 at 11:06 o'clock, a. m., found and determined that the cooperation agreement requirement of the Act (subsection (7)(b)(i)) was "constitutional both on its face *and as applied* . . . ." (Emphasis added.) The order then dissolved the three-Judge panel and referred the case to a single Judge (Chief Judge Battisti) to determine "[t]he question of whether the defendants' conduct violated the provisions of 42 U.S.C. Sec. 1983 . . . ." District Judge Lambros dissented. No appeal to the Supreme Court was taken from that order and it has become final and is res judicata of the issues decided.

On the same day, about an hour later, at 12:14 o'clock p. m., there was filed with the Clerk of the District Court a 25-page Memorandum Opinion and Order of the single Judge, in which he completely disposed of the issue referred to him by the three-Judge panel without further argument or hearing. 355 F. Supp. 1257 (N.D.Ohio 1973).

The single Judge recognized that there had been remanded to him only the one question, whether plaintiffs' rights under Section 1983 had been violated. He stated:

> The question remaining before the court is whether the defendants have used the consent requirement as a tool to perpetuate segregation in violation of 42 U.S.C. § 1983.

(*Id.* at 1259)

In his Memorandum Opinion and Order, however, the single Judge found that the defendant suburbs had committed a prima facie violation of the Fourteenth Amendment to the Constitution by their failure to enter into a cooperation agreement with CMHA to build low-rent, federally-assisted housing in their communities.

On the issue of constitutionality, which had already been decided in favor of the suburbs by the three-Judge panel, the Judge stated:

> Where there is *prima facie* evidence of discrimination, the burden is shift-

---

required by the Authority pursuant to this chapter; . . . .

2. It is significant that no resident of any of the five municipalities has joined with the plaintiffs in this action.

There are some 56 cities and villages in Cuyahoga County within the jurisdiction of CMHA. It has built low-rent housing only in Cleveland and East Cleveland under cooperation agreements duly authorized. It has cooperation agreements with two other mu-

nicipalities in the county. The plaintiffs have selected only the five municipal defendants out of remaining suburbs for low-rent housing projects, and primarily for the benefit of residents of Cleveland. It is of course unusual for residents of one municipality to bring an action in a Federal Court to force low-rent housing by judicial fiat on other municipalities, in which they do not reside, and which may not either need or want low-rent housing.

ed to the defendant suburbs to come forward with a supervening necessity or compelling governmental interest to avoid a finding of unconstitutionality. (*Id.* at 1266).

The Judge then inferred discrimination on the part of the suburbs because of their failure and refusal to enter into cooperation agreements. He further stated:

The evidence amply demonstrates that the suburban defendants' failures and refusals to contract, negotiate with CMHA, or enter into Cooperation Agreements, have the clear effect of discriminating against Negroes by excluding them from residing in these suburban municipalities and perpetuating existing racial concentration and segregation within the individual suburbs and throughout the metropolitan area. In the face of this evidence, the suburban defendants came forward with no logical rationale, compelling or otherwise, to explain their conduct. The record indicates that the actions of the defendant suburbs under color of law, discriminate against Negroes and other low income persons. Such actions violate the plaintiffs' rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution and are in violation of their rights under the various Civil Rights Acts. See 42 U.S.C. Sections 1981, 1982, 1983, 2000d and 3601 et seq. (*Id.* at 1266–1267).

The Judge further said:

The foregoing is contrary to the Thirteenth Amendment and the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, the Civil Rights Act of 1964 and 1968, Title 42 U.S.C. Sections 1981, 1982, 1983, 2000d and 3601 et seq., the United States Housing Act of 1937 as amended, and regulations of the Department of Housing and Urban Development. (*Id.* at 1268)

The single Judge further stated:

State officials are refusing to sign a federally required document with the resulting effect of discrimination. (*Id.* at 1268)

In his judgment order the single Judge granted a rather unique form of relief. He treated the case before him like a school desegregation case and ordered CMHA "to prepare a plan setting forth the number of scattered site units it intends to place in each of the defendant surburbs." The plan was required to include not only the residents of the suburbs but also "residents of the City of Cleveland who wish to move into that community." (*Id.* at 1269).

The order required the municipalities to object to the plan within ninety days and to give reasons if they have any why then cannot absorb the number of houses which CMHA desires to build there. The order further provided:

Unless the reasons . . . are constitutionally permissible and meet the compelling interest test, there will be no alternative but to conclude that the suburb's failure to sign a Cooperation Agreement is for a constitutionally impermissible reason, to wit: racial discrimination and appropriate judicial action will be undertaken. (*Id.* at 1269) [3]

---

3. Our colleague, in his dissent, asserts that this clear and definite order is merely "tentative" and "interlocutory", and that we really had no jurisdiction to hear this appeal.

This issue was laid to rest when shortly after the appeal had been filed we unanimously entered the following Order denying appellee's motion to dismiss the appeal:

"Before Weick, Edwards and Peck, Circuit Judges.

"Upon consideration it is ORDERED that the motion to dismiss the appeal be and it is hereby denied. Gillespie v. United States Steel Corp., 379 U.S. 148 [85 S.Ct. 308, 13 L.Ed.2d 199] (1964).

"It is further ordered that this appeal be advanced for hearing before the panel, on its merits, during the final week of the February, 1974 Session of this Court.

"Appellants shall file their brief and appendix within twenty (20) days after the

The five municipalities appealed. We reverse.

■ The rulings of the single Judge and his order conflict with the decision of the three-Judge panel, and also conflict with the decision of the Supreme Court in James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), where the court stated:

> date of entry hereof, and appellees shall file their brief within twenty (20) days thereafter."

After oral argument and submission, our colleague unilaterally brought up the matter again in his dissenting opinion. The question of jurisdiction, however, can be raised at any time.

*Gillespie* indicated that an appellate court should give consideration to four factors in determining whether an order of a lower court is "final" within the meaning of 28 U.S.C. § 1291:

1—Whether an order is final depends on whether it has been given a "practical rather than technical construction," Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

2—Whether an order is final depends on whether the issue appealed is fundamental to the further conduct of the litigation in the lower court.

3—Whether an order is final depends on whether the parties will be put to additional expenses if the appealed issue is not resolved by the appellate court.

4—In cases where the issue of finality is close or marginal, the court of appeals should find in favor of finality.

Applying these factors to the present case, it is clear that the appeal of the five municipalities should not be dismissed for lack of jurisdiction under 28 U.S.C. § 1291. The order from which the appeal was taken was indeed final.

First, as to practical effect, while the District Court did not at that time actually order the five municipalities to sign a cooperation agreement, it did hold that the municipal defendants had to show a "compelling necessity" why they had not signed. The Court went on to reject all the reasons which the defendants might possibly advance as meeting that "compelling necessity" test.

Second, there can be no doubt that the issue of whether the municipalities have violated 42 U.S.C. § 1983 by their failure to determine their need for public housing and to sign cooperation agreements, is fundamental to the further conduct of this case. Similarly, the question of jurisdiction of the District Court over the municipalities and CMHA and over the subject matter is also fundamental to the disposition of the case.

Third, the great inconvenience and the cost and expense of a second trial is all-important to the municipalities, particularly since the trial record contains all of the evidence necessary for this Court to make a full and complete disposition of all of the issues in this case. The single Judge did not need any additional evidence to make his findings of constitutional violation and remedial order, all of which were prepared and filed almost contemporaneously with the order of the three-Judge Court. All that was necessary to be done was for CMHA to prepare a plan for the low cost public housing in the five municipalities, for the Cleveland residents, and for the municipalities then to approve it or to show good cause for not doing so. The consent of the governing bodies of the municipalities, which is required by the Act as a condition precedent for the housing loans, is completely abrogated by the Order. This consent requirement was held mandatory by our decision in Cuyahoga Metropolitan Housing Authority v. Harmody, 474 F.2d 1102 (6th Cir. 1973). In our opinion, the findings of discrimination by the Court are not supported by substantial evidence and are clearly erroneous.

Fourth, the issue of finality in the present case is not even close. In Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Supreme Court recently reaffirmed the basic teachings of *Gillespie*:

> "This Court has been inclined to follow a 'pragmatic approach' to the question of finality. Brown Shoe Co. v. United States, 370 U.S. 294, 306 [82 S.Ct. 1502, 8 L.Ed.2d 510] (1962). And we have said that a final decision, within the meaning of § 1291, 'does not necessarily mean the last order possible to be made in a case.' Gillespie v. United States Steel Corp., 379 U.S. 148, 152 [85 S.Ct. 308, 13 L.Ed.2d 199] (1964); see Cohen v. Beneficial Loan Corp., 337 U.S. 541, 545 [69 S.Ct. 1221, 93 L.Ed. 1528] (1949)." (Fn. 28, at 722, 94 S.Ct. at p. 2022.

By the Housing Act of 1937 the Federal Government has offered aid to state and local governments for the creation of low-rent public housing. However, the federal legislation does not purport to require that local governments accept this or to outlaw local referendums on whether the aid should be accepted. (*Id.* at 140, 91 S. Ct. at 1333.)

The Court recognized that the people of a community have the right to decide whether they want low-rent housing, stating:

The people of California have also decided by their own vote to require referendum approval of low-rent public housing projects. This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues. It gives them a voice in decisions that will affect the future development of their own community. This procedure for democratic decisionmaking does not violate the constitutional command that no State shall deny to any person "the equal protection of the laws." (*Id.* at 142–143, 91 S.Ct. at 1334)

The Supreme Court thus construed the plain language of the Act to mean exactly what it says, namely, that it is for the municipalities to decide whether they need low-rent housing and whether they desire to sign cooperation agreements. There is no basis to infer discrimination upon the part of a municipality for doing what it has a lawful right to do under the express provisions of the housing Act.

■ We think the three-Judge Court was clearly right in ruling as it did that the Act was not only constitutional, but that it was constitutionally applied by the municipalities. It has now become final because the plaintiffs have not prosecuted an appeal to the Supreme Court.

The findings of a violation of the plaintiffs' Section 1983 rights are also utterly inconsistent with the decision of the three-Judge panel, made only about one hour earlier. Plaintiffs could have a cognizable Section 1983 claim only if they could show that the Act was unconstitutional or that it had been unconstitutionally applied by local officials. Once the statute was held valid on its face and as applied by the five munici-

palities, there was no way in which a Section 1983 case could be maintained; the only proper thing then for the single Judge to do with the Section 1983 claim was to dismiss it.

■ We are of the opinion further that there was a lack of jurisdiction over the municipalities on the Section 1983 claim because they cannot be considered as "persons". City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Johnson v. City of Cincinnati, 450 F.2d 796 (6th Cir. 1971).

We do not doubt that Section 1983 actions may lie against individual government officials to restrain them from violating the constitution. Egan v. City of Aurora, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961), and Birnbaum v. Trussell, 347 F.2d 86 (2d Cir. 1965).

Here the order appealed from was not an order against individual councilmen, but was an order only against the five municipalities. The rulings of the Supreme Court in *City of Kenosha, Moor,* and *Monroe* cannot be circumvented by joining with the municipalities, as parties defendant, the individual members of their governing bodies, against whom no relief was sought. The single Judge granted relief only against the five municipalities and CMHA.

In oral argument one of counsel for appellees even went so far as to suggest that the single Judge could order individual councilmen to vote for a cooperation agreement. While this course of action might have been a way to order relief without exceeding jurisdictional bounds, we think such action would have been highly improper. Quite simply, it would have been a violation of the separation of powers with the court acting as a legislature. We do not regard city councilmen, mayors, or managers, as state officers.

In our opinion plaintiffs have failed to prove that any of their constitutional

rights were violated. The mere fact that the defendant municipalities have not consented to the project and have not entered into cooperation agreements does not prove a violation of constitutional rights of anyone.

In Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the city of Jackson, Mississippi, decided to cease operation of segregated municipal swimming pools that it had been operating. The Supreme Court found there was clearly state action in the closing of the pools, but could find no denial of equal protection of the law. The Court held that a neutral policy which had a greater impact on a minority was not invalid on that basis.

The minority groups in *Palmer* relied heavily on the motives of those who closed the swimming pools; however, the Supreme Court was willing to look only to the impact of the action taken, not to motives.

In the present case the failure of the suburbs to provide low-rent housing affected alike both low-income blacks and whites. There may have been a greater impact on the blacks, but that, under *Palmer,* is not sufficient to establish a constitutional violation.

In Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), the Court held that no one has a constitutional right to adequate housing. Since a person has no right to public housing in his own city, it follows that he has no such right in a municipality in which he does not reside.

*See also* Ranjel v. City of Lansing, 417 F.2d 321 (6th Cir. 1969), cert. denied, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 rehearing denied, 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970), on neutral action of referendum.

In Citizens Comm. for Faraday Wood v. Lindsay, 362 F.Supp. 651 (S.D.N.Y. 1973), suit was filed against the City of New York, the Housing and Development Administration of the City (HDA), and John Lindsay, then Mayor of the City, alleging racial discrimination by refusing to approve an application for construction of a housing project in violation of Section 1983 and other civil rights statutes, as well as in violation of the Fair Housing Law, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. The District Court followed City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), holding that the Court has jurisdiction under 28 U.S.C. § 1343 of the individual defendants only and not of the City nor HDA. The Court, in considering its jurisdiction under the Federal Housing Law and Title VIII of the Civil Rights Act of 1968, held that in the denial of the application for housing, which similarly affected whites as well as blacks, there was no racial discrimination. In so holding the Court relied on *Palmer* and *Valtierra,* *supra.*

It is significant that the Court in *Citizens Comm. for Faraday Wood* specifically rejected the decision of the single Judge in the present case. The Court in that case said:

> To the extent that other cases, including most recently Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1245 (N.D.Ohio 1973), take a contrary position, this Court must respectfully disagree. In view of *Valtierra* and *Palmer,* it appears that in housing, for a racially discriminatory effect to be found, there must be some showing that a policy or activity which has a racially discriminatory effect results from a prior pattern of discrimination or that such policies affect only racial minorities. To the extent that other courts have carried the idea of "discriminatory effect" in the housing field further, this Court rejects the position they have espoused while again noting that the decisions turned on their individual facts. To hold that any action or failure to act is unconstitutional because it has an adverse effect on minorities, even though it affects members of the majority as well—albeit to a lesser degree—would be carrying the idea of

discriminatory effect too far. Under such an approach a governmental unit could never stop a program for entirely sound reasons even at an early talking stage if it would deprive minorities of something they would have had if the program came to fruition. (362 F.Supp. at 659).

The Court further stated:

Nor every state action which has some adverse effect on minority persons is unconstitutional or in violation of a statute. For example, it must be shown that the effect of the action under challenge falls more heavily on minority group members than on the population as a whole. Or it must be shown that the discriminatory effect results from a prior pattern or practice of discrimination. (362 F.Supp. at 657).

The single Judge made no findings of a prior pattern or practice of discrimination of the suburbs against racial minorities, or that the failure or refusal of the municipalities to sign cooperation agreements affected racial minorities in Cleveland any differently than other ethnic groups living in that inner city. The Judge has not pointed out any evidence of purposeful discrimination of each of the municipalities against racial minorities.

There was not a scintilla of evidence that any representative of CMHA or of the plaintiffs ever requested an appearance or appeared before the city councils of any of the defendant municipalities (the city councils being their governing bodies) to request that they or any of them approve a low-rent housing project or that they enter into a cooperation agreement.

The governing bodies of the five municipal defendants were never given an opportunity to pass upon the matter; nevertheless they were charged with discrimination against blacks for failure to take affirmative action.[4]

Plaintiffs' remedy, if they were dissatisfied with the decision of the three-Judge panel, was to appeal to the Supreme Court. That decision was binding on the single Judge and it could not be collaterally attacked.[5]

The judgment of the District Court is reversed and the cause is remanded for dismissal of the complaints.

EDWARDS, Circuit Judge (dissenting).

This case is a civil rights case attacking the growing evil of apartheid in urban America. Plaintiffs are citizens of Cleveland, Ohio, who claim to represent the class of poor persons in need of housing in the Cleveland area, most of whom are black. They assert that the building of housing authorized by national law, 42 U.S.C. § 1401 et seq. (1970), for their benefit is being blocked by the named suburban cities because of a desire to exclude them and their class counterparts because of racial discrimination. The mechanism, allegedly discriminatorily employed by the defendant municipalities, is refusal to sign cooperation agreements between their cities and the Cuyahoga Metropolitan Housing Authority. The CMHA has

---

4. There was evidence that the Director of CMHA had met with the Mayors of Euclid, Garfield Heights, and Westlake. These meetings were of an informational nature. No request was made for the municipalities to approve a housing project or to sign a cooperation agreement. The CMHA Director did not even meet on an informal basis with the Mayors of Parma and Solon. CMHA, before and after the filing of the suits, addressed informational letters to the Mayors and City Managers of all of the municipalities or villages, sometimes enclosing pamphlets relative to housing. The Mayors or Managers of the municipalities are not the "governing bodies" of the municipalities.

5. The first sentence in the dissent reads:
   "This case is a civil rights case attacking the growing evil of apartheid in urban America."
   Under our constitutional form of Government no such evil can ever exist in America.
   We think, however, that the remedy for social change lies with Congress rather than with the courts. We have no discretion but to obey all valid laws enacted by Congress, and to follow all applicable decisions of the Supreme Court.

jurisdiction over the entire area concerned (including defendant suburbs) and it desires to build low rent housing within defendant cities to relieve the area housing shortage.

The case was originally filed before a three-judge court to test the constitutionality of the statutory requirement of cooperation agreements, 42 U.S.C. § 1415(7)(b)(i) (1970). After the submission of stipulations of fact, depositions, and the hearing of evidence, the three-judge court ruled that the cooperation agreement provision in the Housing Act was constitutional "on its face and as applied." The three-judge court, however, specifically declined to rule on Count II of plaintiffs' complaint which stated an action under 42 U.S.C. § 1983 (1970) against the five municipalities for allegedly refusing and failing to sign the cooperation agreements because of racial discrimination and referred Count II to the *Chief Judge of the United States District Court for the Northern District of Ohio* for disposition. (Count II of the complaint is printed in full, except for a portion directly applicable to the three-judge court decision, as Appendix A.)

Shortly after the three-judge court decision was announced, the Chief Judge of the District Court announced an opinion in the portion of the case which had been referred to him. In it he summarized his tentative views of the evidence which he had heard as part of the three-judge court. (*See* Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1257 (N.D.Ohio 1973)). The Chief Judge found racial segregation in both Cuyahoga County and in the City of Cleveland:

"Cuyahoga County is a racially segregated county. The population of Cuyahoga County in 1970 was 1,721,300; 328,419 (19.1%) of whom were Negro. 87% of these 328,419 Negroes reside in Cleveland. Of the 40,578 who reside outside of Cleveland but within Cuyahoga County, 80% live in three eastern suburbs: 23,196 in the City of East Cleveland; 5,250 in Shaker Heights; and 4,007 in War-

rensville Heights. In 1970 the defendant City of Garfield Heights had 1,789 Negro (4.6%) residents. All but two resided in one area of Garfield Heights adjacent to the City of Cleveland. The other four defendant suburban cities' population in 1970 was from 99.1% to 99.8% Caucasian.

In Banks et al. v. Perk et al., 341 F. Supp. 1175 (N.D. Ohio 1972) the following findings of fact were made as to the City of Cleveland and are incorporated herein:

'The City of Cleveland is a racially divided city. Except for a small pocket of Negroes on the west side of the Cuyahoga River, in the Bellaire Section, almost all (96%) of the Negro citizens of the City live on the east side of the River. The Negro population of the City of Cleveland has grown dramatically since 1930 when Negroes constituted only 8% of the total population of the City. Today it is more than 38%. Since 1950 three neighborhoods on the east side of Cleveland, Hough, Glenville and LeeSeville, have changed from primarily White to almost entirely Negro. As a result, the schools in the City of Cleveland are quite badly segregated. Of the 183 public schools in the City, 85 are 90% to 100% Negro, and 72 are under 10% Negro. Approximately 95% of the Negro children attending public schools in the City attend schools which are all or substantially all Negro. In addition, in the last six years more than 5,000 jobs have moved from Cleveland's inner city to the outskirts of the City and to nearby suburbs. Access to these jobs has decreased for those who live in the inner city.' 314 F.Supp. at 1178." *Id.* at 1259–1260.

The District Judge correctly summarized the question which the three-judge court had referred to him for determination:

"The question remaining before the court is whether the defendants have used the consent requirement as a tool

to perpetuate segregation in violation of 42 U.S.C. § 1983." *Id.* at 1259.

Analyzing the evidence which had been submitted to the three-judge court, he held that a prima facie case of discrimination had been made out against the defendant suburbs and he ordered the Cuyahoga Metropolitan Housing Authority to draft a plan to alleviate the housing shortage and the pattern of segregation he had found with the five suburbs, their officers being ordered to file any objection thereto within 90 days thereafter.

It is these tentative findings and these orders to draft a plan which are sought to be appealed in this case.

The majority opinion in our court elects to treat the interlocutory orders of the District Court as final. It asserts that the three-judge court decided all the issues in this case and, hence, its decision controls decision in this case under the doctrine of res judicata. The majority also holds, as I understand the matter, that individual defendants whose action is needed to approve the cooperation agreements are absolutely immune from the relief sought in this § 1983 action, even though their acts may be violative of the federal constitution. The majority opinion also holds that plaintiffs have failed to prove their case and orders the District Judge to dismiss the complaint, although the appeal was taken before final hearings and final adjudication of the § 1983 issue had been completed.

I dissent.

First, it is clear that there has been no final order entered in this case. Nor has the District Court certified any controlling questions of law. *See* 28 U.S.C. § 1292(b) (1970). On that basis alone, we might well have been better advised to dismiss this appeal. The doctrine of Gillespie v. United States Steel Corp., 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), of course, gives this court power to interpret the word "final" so as to accept an appeal where failure to do so would serve to deny justice. The facts in this case convince me that the interests of justice do not require us to accept this appeal. None of the suburban cities involved stand to lose any fundamental rights by the completion of this case before the District Court. They might yet prevail there entirely, and if they did not, they would have the clear right to appeal thereafter.

Second, the majority opinion holds that the three-judge court opinion and judgment in this case decided all of the issues, and, hence, rendered the present case subject to dismissal on grounds of res judicata. Quite clearly the three-judge court did not think that it was deciding all the issues in the case, for it specifically referred Count II stating the § 1983 case to the Chief Judge of the District Court. It is interesting to note that the opinion in the three-judge court case was written by Chief Judge Battisti. His interpretation of his own opinion is certainly contrary to any disposition on grounds of res judicata.

It appears to me that the contention that the three-judge court decision controls this case is answered by the explicit language of the opinion filed therein:

"Having determined that 42 U.S.C. § 1415(7)(b) is constitutional both on its face and as applied, we find no further questions which are required to be heard by this three judge court. The question of whether the defendants' conduct violated the provisions of 42 U.S.C. § 1983 is not a proper matter for a three judge court. Therefore, without reaching any determination of the merits of Count Two of each complaint, this court remands consideration of those claims to Chief Judge Frank J. Battisti. Metcalf v. Swank, 293 F.Supp. 268 (W. [sic] D.Ill.1968); See Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971)." Máhaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1245, 1250 (N.D.Ohio 1973).

It should be noted that the three-judge court did not, as the majority opinion asserts, decide that the conduct

of the defendant municipalities was constitutional. That very question was referred to the Chief Judge of the District Court who made a tentative decision to the contrary.

Third, one of the most important questions in this case is whether or not injunctive relief may be obtained for violations of constitutionally established rights against the responsible officials of a city in their personal or official capacities. As I read the cases relied upon by the majority, all that they have thus far determined is that the municipalities themselves cannot be sued for damages or injunctive relief under § 1983. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). It is clear, however, that suits for injunctive relief (and damages) under § 1983 do indeed lie against municipal and county officials to restrain them from violating provisions of the federal constitution. Egan v. City of Aurora, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961); Myers v. Anderson, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 134 (1915); Tinker v. Des Moines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 731 (1969), and Birnbaum v. Trussell, 347 F.2d 86 (2d Cir. 1965). In this last case the Second Circuit said as follows:

"As we read the complaint it alleges that the defendants, under color of state law, deprived the plaintiff of his rights under the Fourteenth Amendment, in violation of Rev.Stat. § 1979 (1875), 42 U.S.C. § 1983 (1958), and conspired to deprive him of equal protection of the laws in violation of Rev.Stat. § 1980(3) (1875), 42 U.S.C. § 1985(3) (1958). A showing that defendants acted 'within the scope of their employment and authority' is not sufficient to defeat the district court's jurisdiction. It would nullify the whole purpose of the civil rights statutes to permit all governmental officers to resort to the doctrine of official immunity. The statutory condition of defendant's acting 'under color' of state or territorial law contemplates that he act in an official capacity. To the extent that state or municipal officers, such as the defendants Trussell and Mangum, violate or conspire to violate constitutional and federal rights, the Civil Rights Laws, §§ 1979 and 1980(3), 42 U.S.C. §§ 1983 and 1985(3), abrogate the doctrine of official immunity. See The Doctrine of Official Immunity Under the Civil Rights Acts, 68 Harv.L.Rev. 1229 (1955)." Birnbaum v. Trussell, *supra* at 88–89 (Footnotes omitted.)

Other cases include Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959), and Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir.), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1970). Although the relief found to be available in this case was sought against the school superintendent and the individual trustees of the school district, the discussion is informative:

"Turning then to the officials, the trustees and the superintendent, it seems well settled that § 1983 authorizes a suit against them. Federal judicial power has long been invoked to compel state officials to discharge their constitutional duties. See Board of Commissioners of Knox County v. Aspinwall, 1861, 65 U.S. (24 How.) 376, 16 L.Ed. 735; Home Telephone & Telegraph Co. v. Los Angeles, 1913, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510.

In numerous cases since Monroe v. Pape, the Supreme Court has permitted relief under § 1983 against state officials sued as such, without mention of that case. Griffin v. County School Board of Prince Edward County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (county board of supervisors), and see other cases which are the progeny of Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, such as Alexander v. Holmes County Board

of Education, 1969, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19, and Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477. See also Rinaldi v. Yeager, 1966, 384 U.S. 305, 86 S.Ct. 1497, 16 L:Ed.2d 577 (state prison warden); Davis v. Mann, 1964, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (state election officials); WMCA v. Lomenzo, 1964, 377 U.S. 633, 84 S. Ct. 1418, 12 L.Ed.2d 568 (state election officials); Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (state election officials); Wesberry v. Sanders, 1964, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (governor and secretary of state); Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (state election officials)." Harkless v. Sweeny Independent School District, *supra*, at 323.

The majority opinion in this case does not deny that suits against municipal officials for constitutional violations are permissible under § 1983.

The majority contends, however, that the councilmen of the affected municipalities are immune from judicial orders because of the doctrine of separation of the powers of government. Justice Stewart, then a member of our court, in Nelson v. Knox, 256 F.2d 312 (6th Cir. 1958), made these observations on municipal legislative immunity:

"We hold at the outset that the extent of the defendants' insulation from liability under the Civil Rights Act cannot properly be determined by reference to the local rule in Michigan. Surely each state cannot be left to decide for itself which of its officials are completely immune from liability for depriving a citizen of rights granted by the Federal Constitution. The question must be decided as a matter of general law.

In the light of the relevant federal decisions, we cannot agree that members of a municipal legislative body share the complete immunity from liability which is enjoyed by judges and state legislators. In Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, the Supreme Court affirmed as modified a decree of injunction against the members of the Board of Commissioners of Jersey City, New Jersey, in an action brought under the Civil Rights Act. Nowhere in the five opinions filed in the Hague case does it appear that any of the seven Justices who participated were of the view that municipal legislative officials are clothed with such complete immunity." Nelson v. Knox, *supra*, at 314. (Footnote omitted.)

The Supreme Court has recently dealt with the absolute immunity claims of the highest official of a state and rejected such immunity. In Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Supreme Court said:

"The District Court acted before an answer was filed and without any evidence other than the copies of the proclamations issued by Respondent Rhodes and brief affidavits of the Adjutant General and his assistant. In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor, and took judicial notice that 'mob rule existed at Kent State University.' There was no opportunity afforded petitioners to contest the facts assumed in that conclusion. There was no evidence before the Court from which such a finding of good faith could be properly made and, in the circumstances of these cases, such a dispositive conclusion could not be judicially noticed. We can readily grant that a declaration of emergency by the chief executive of a State is entitled to great weight but it is not conclusive. Sterling v. Constantin, *supra*. [287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932).]

The documents properly before the District Court at this early pleading stage specifically placed in issue whether the Governor and his subordi-

nate officers were acting within the scope of their duties under the Constitution and laws of Ohio; whether they acted within the range of discretion permitted the holders of such office under Ohio law and whether they acted in good faith both in proclaiming an emergency and as to the actions taken to cope with the emergency so declared. Similarly, the complaint places directly in issue whether the lesser officers and enlisted personnel of the Guard acted in good faith obedience to the orders of their superiors. Further proceedings, either by way of summary judgment or by trial on the merits, are required. The complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint." Scheuer v. Rhodes, *supra*, 94 S.Ct. at 1693.

There is no question but that municipal councilmen may assert a qualified immunity from suit when acting within the scope of their legislative duties. *See* Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Nelson v. Knox, 256 F.2d 312 (6th Cir. 1958); Lynch v. Johnson, 420 F.2d 818 (6th Cir. 1970). Of course, the scope of legislative duties cannot include acts which violate the federal constitution.

In my opinion we cannot and should not pass on any claims of qualified immunity until the charges of racial discrimination have been finally heard and decided.

Fourth, the majority opinion asserts that plaintiffs have failed to prove their claims. The trial judge, however, who has heard the evidence thus far submitted, has found the facts in some detail and has held that plaintiffs have proved a prima facie case. The majority does not assert that any of the facts found are "clearly erroneous." Rather, it seems to assume them as true and to assert as a matter of law that even if plaintiffs should prove that the defendant councilmen's sole reason for refusing to sign the cooperation agreements was a desire to exclude Negroes from living in their cities, that they had the right to do so.

This cannot be the law if this nation respects its Constitution.

James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), upon which the majority relies, upheld a referendum provision applicable to low rent housing in the Constitution of the State of California because it was racially neutral on its face.

The three-judge court in this case upheld the constitutionality of the local cooperation agreement of the federal housing act on the same ground. But neither the three-judge court nor the Supreme Court in *Valtierra* held that city officials could employ the racially neutral language of the cooperation agreement provision in order to exclude citizens of a different race from residing in their cities.

It may well be that plaintiffs, if afforded the complete adjudicatory process in the District Court, will not be able to prove that defendants' actions or inactions are based on constitutionally impermissible grounds. But this record does not suggest that they should be denied their right to complete their case.

The appeal should be dismissed as premature. If not, then the District Judge's order should be affirmed and the case should be remanded to the District Court for further proceedings.

## APPENDIX A

### SECOND COUNT

25. This is an action for declaratory judgment authorized under Section 2201 of Title 28 of United States Code to enforce rights secured by the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, by the Thirteenth Amendment to the United States Constitution, and by the Supremacy Clause of Article VI of the United States Constitution.

This is also an action under Section 1983 of Title 42 of the United States Code to redress the deprivation of rights, privileges and immunities secured by the Constitution of the United States and by the United States Housing Act of 1937, as amended, 42 U.S.C. Section 1401 et seq.; the Civil Rights Act of 1964, 42 U.S.C. Section 2000d; Section 1981 of Title 42 of the United States Code; Section 1982 of Title 42 of the United States Code; the Civil Rights Act of 1968, 42 U.S.C. Section 3601 et seq.; and the Housing and Urban Development Act of 1968, 12 U.S.C. Section 1701 et seq.

Jurisdiction is also conferred by Sections 1343(3), 1343(4) and 1331(a) of Title 28 of the United States Code. The matter in controversy exceeds, exclusive of interest and costs, the sum of ten thousand dollars.

\*   \*   \*   \*   \*   \*

26. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 24, inclusive, of the First Count of this Complaint as if fully set forth herein.

27. The territorial jurisdiction of defendant CMHA includes the City of Cleveland and 54 other cities and villages, including each of defendant Cities. About 20% of the persons in the jurisdictional area of defendant CMHA are Negro. About 87% of such Negro population lives in the City of Cleveland.

28. The greater Cleveland area presents the typical American urban community situation, where the great majority of Negro and other minority group residents are confined to certain parts of the central city. The white middle class has migrated to the suburbs leaving the central city to those of lower economic means, for the most part members of minority groups, who are unable to afford suburban housing.

29. Employment opportunities for lower and moderate income persons have increased in the suburban communities of the greater Cleveland area, including each of defendant Cities, and have de-creased in the City of Cleveland where the majority of Negroes and other minority groups are confined.

30. There are presently about 4,200 families on the waiting list of defendant CMHA who are qualified for low rent housing. These include families displaced from former housing by reason of governmental action, families subject to disability, veterans or families of persons in the armed services of the United States, and elderly persons. Most of the 4,200 families on the waiting list of defendant CMHA are Negro and other minorities. The present waiting time for families applying to defendant CMHA for low rent housing is from two to four years. There are many more persons within the territorial jurisdiction of defendant CMHA who are eligible for low rent housing but are not on the waiting list of defendant CMHA.

31. Over the past several years many units of housing in the greater Cleveland area have been demolished by action of public agencies resulting in the displacement of low income persons from their homes. Most of the persons so displaced have been Negroes.

32. Under present plans, over the next several years additional units of housing in the greater Cleveland area will be demolished by action of governmental agencies resulting in the displacement of additional low income families from their homes. Many of the persons displaced will be Negroes.

33. There is not an adequate supply of decent, safe and sanitary housing in the territorial jurisdiction of CMHA to rehouse persons who have been displaced or will be displaced by public action.

34. There are low income persons residing in each of defendant Cities who are eligible for low rent housing.

35. Defendant CMHA entered into cooperation agreements as required under the Housing Act of 1937, as amended, 42 U.S.C. Section 1415(7)(b), with the City of Cleveland in 1937, 1941 and 1949 under which it was authorized to build a total of 12,000 housing units,

11,998 of which are either built, under construction or committed. In 1969 defendant CMHA entered into a cooperation agreement with the City of East Cleveland authorizing the construction of 205 units in that municipality. Defendant CMHA has not entered into cooperation agreements with any other municipality.

36. On information and belief plaintiffs state that defendant CMHA has attempted to enter into cooperation agreements with each of defendant Cities, but that the governing bodies of the defendant Cities have declined to enter into cooperation agreements with defendant CMHA.

37. The failure of defendant CMHA to enter into cooperation agreements with defendant Cities or other municipalities within its territorial jurisdiction has limited low rent housing to the Cities of Cleveland and East Cleveland. This limitation discriminates against low income persons by virtue of their class and against Negro persons because of their race.

38. The confinement of persons eligible to reside in low rent housing in areas which are predominately Negro and predominately low income has resulted in unequal access by low income families to employment opportunities, health care, educational facilities and governmental services, to their physical and psychological detriment.

39. The cooperation agreement requirement of the Housing Act of 1937, as amended, 42 U.S.C. Section 1415(7)(b), as it has been used within the territorial jurisdiction of defendant CMHA, by defendant CMHA, by each defendant City and by other municipalities:

(a) denies plaintiffs and members of the classes they represent the equal protection of federal laws designed to provide safe, sanitary and decent housing to them within the territorial jurisdiction of defendant CMHA at rents which they can afford and of federal laws designed to provide them access to housing within the territorial jurisdiction of defendant CMHA without regard to their race or class;

(b) denies plaintiffs and members of the classes they represent of choices as to the location of their housing within the territorial jurisdiction of defendant CMHA;

(c) deprives plaintiffs and members of the classes they represent of equal access to employment opportunities, health care, educational facilities and governmental services within the territorial jurisdiction of defendant CMHA;

(d) continues a policy and practice of discrimination and segregation on the basis of race and class in low rent housing within the territorial jurisdiction of defendant CMHA;

(e) intensifies the segregation of low rent housing within the territorial jurisdiction of defendant CMHA along class and race lines;

(f) constitutes a deprivation of the life, liberty and property of the plaintiffs and members of the classes they represent in violation of the due process clause of the Fourteenth Amendment to the United States Constitution;

(g) denies the plaintiffs and members of the classes they represent the equal protection of the law in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution;

(h) constitutes a means whereby the badges and vestiges of slavery are inflicted upon the plaintiffs and members of the classes they represent in violation of the Thirteenth Amendment to the United States Constitution;

(i) denies the plaintiffs and members of the classes they represent the full and equal benefit of laws in violation of Section 1981 of Title 42 of the United States Code;

(j) denies the plaintiffs and members of the classes they represent the

rights of citizens to purchase, lease and hold real property in violation of Section 1982 of Title 42 of the United States Code; and

(k) is contrary to the laws and Constitution of the United States and in violation of the Supremacy Clause of Article VI of the United States Constitution.

40. Plaintiffs and members of the classes they represent are irreparably injured by the operation of the cooperation agreement requirement of the Housing Act of 1937, as amended, 42 U.S.C. Section 1415(7)(b), as it has been used within the territorial jurisdiction of defendant CMHA, and such irreparable injury will continue until such cooperation agreement requirement shall have been declared invalid and of no further force and effect as applied to plaintiffs and defendant CMHA and defendant Cities. Plaintiffs and members of the classes they represent have no adequate remedy at law.