**AFRO AMERICAN PATROLMEN'S LEAGUE et al., Plaintiffs,**

v.

**Robert DUCK, etc., et al., Defendants.**

**Civ. No. 73-327.**

United States District Court,
N. D. Ohio, W. D.

Nov. 13, 1973.

Green & Lackey, Joseph A. Flores, Toledo, Ohio, for plaintiffs.

John J. Burkhart, City Law Dep't, Toledo, Ohio, for defendants.

Richard S. Walinski and T. Scott Johnston, Toledo, Ohio, for intervenors.

## OPINION

DON J. YOUNG, District Judge:

The plaintiffs in this case are an organization of police officers, and two individual police officers, suing as representatives of a class. The defendants are the Chief of Police, the City Manager, Safety Director, members of the Civil Service Commission, and Executive Director of the Civil Service Commission of the City of Toledo, Ohio. Two policemen's organizations sought but were denied leave to intervene as defendants.[1] The fifteen individuals who stood highest on the sergeant's eligibility list also sought, and were granted, leave to intervene as parties defendant.[2]

This action was filed on August 13, 1973. Prior to this, on August 2, 1973, the plaintiffs herein sought leave to intervene in the pending case of Sarabia v. Duck, Civil No. C 72–263 and to file therein an amended complaint raising the issues set forth in the complaint herein. Hearing was held upon the motion, and while the plaintiffs were given leave to intervene in the pending case, they were denied leave to file their amended complaint, since the issues tendered therein were unrelated to the issues in the pending case. Case No. C 72–263 concerns alleged racial discrimination in police hiring practices. The

---

1. The Toledo Police Patrolmen's Association and the Fraternal Order of Police, Lodge #40 sought a stay of the trial to appeal this Court's order denying their intervention which they sought pursuant to Rule 24(b), Fed.R.Civ.P. This Court overruled their request for the stay, and the United States Court of Appeals for the Sixth Circuit affirmed the denial. Afro American Patrolmen's League, et al. v. Duck, No. 73–8164 (6th Cir. filed Oct. 19, 1973).

2. These defendants sought intervention pursuant to Rule 24(a), Fed.R.Civ.P.

present case involves alleged racial discrimination in police promotion practices.

As originally presented in the amended complaint in Case No. C 72–263, the plaintiffs' cause of action sought to restrain the defendants from promoting police sergeants, captains, and lieutenants from eligibility lists established for captains on August 10, 1971, and for lieutenants and sergeants on May 17, 1973. Three promotions had been made from the captains' list, and three from the lieutenants' list on August 1, 1973, and fifteen promotions were about to be made from the sergeants' list.

By stipulation, the promotions from the sergeants' list were stayed pending the filing and disposition of this case, and the case was assigned for trial commencing on October 23, 1973. Trial was commenced on that day, and concluded on October 30, 1973.

## I. *Class Action Determination*

▮ The complaint in this case was filed as a class action by the named plaintiffs as representatives of a class consisting of all present and future minority members of the Toledo Police Department who have been discriminated against by the defendants' use of unvalidated and culturally biased tests, practices, and procedures.

At the outset of the case, the defendants contended that the only persons who could properly be considered as members of the class of plaintiffs were those individuals who were eligible to and did take the promotional civil service examination for sergeant, and that those persons were not too numerous to be named as individual parties plaintiff. However, it seemed clear at the time, and the evidence made it much clearer, that the really important persons affected by this litigation are those minority members whose interest in becoming members of the police department in the future is gravely affected by promotion-

al practices in that department. For if the police department is to be attractive to minorities it is not enough that the hiring practices be on a nondiscriminatory basis but also that advancements and promotions be made nondiscriminately. There are unquestionably large numbers of such persons, but who they are cannot be precisely ascertained. Class actions are particularly well suited to the determination of the rights of such groups.[3]

It is not even suggested that the plaintiffs are not members of or would not properly represent the members of the class, or that the other elements of a class action are not present.

The Court ruled tentatively at the beginning of the trial that the matter would proceed as a class action, the class being as described in the first paragraph of this section of this opinion. After hearing the evidence, the Court is satisfied that its tentative determination of the class action issue was correct. This action will therefore proceed as a class action on behalf of the members of the hereinbefore described class.

## II. *The Burden of Proof*

There was much argument both at pre-trial and at trial about who was to carry the burden of proof. It is possible to have a great deal of technical argument on this point, and this possibility was rather well explored herein.

▮ Technically, of course, the plaintiff has the burden of proof in ordinary litigation. Once the plaintiff establishes a prima facie case by the requisite degree of proof, which in this case would be a preponderance of the evidence, the defendant must offer sufficient evidence to equal the weight of plaintiffs' evidence.[4] In the sense that after plaintiff has established a prima facie case, the defendant must offer countervailing evidence, or fail, it can be said that the burden of proof has shifted to the de-

---

3. See e. g., Matthies v. Seymour Mfg. Co., 270 F.2d 365, 370–371 (2d Cir. 1959) ; 3B J. Moore, Federal Practice ¶ 23.05 (2d ed. 1971).

4. Dobbins v. Local 212, Int'l Bhd. of Elec. Wkrs., 292 F.Supp. 413, 443 (S.D.Ohio 1968).

fendant. Actually, the burden of proof has not shifted. All that has shifted is the burden of going forward with the production of evidence.[5]

■ In civil rights cases involving an alleged discrimination as to race, religion, sex, or other matters, since the courts are dealing with imponderables concerning which it is difficult to make factual proof, it is usually argued that all the plaintiff needs to do is to show that there is a numerical imbalance in the number of persons of different groups in the defendants' service and the numbers of persons of such groups in the general population, and that this imbalance is great enough to be statistically significant. Once the plaintiff has established this statistically significant imbalance, a presumption arises that it is the result of discriminatory practices on the part of the defendant. The defendant must then offer evidence to rebut this presumption or fail.[6]

It has been said that "While a mere discrepancy between minority community population and employment population may not of itself be sufficient to establish a *prima facie* case of discrimination [citations omitted], it does invite inquiry [citations omitted]. In some cases, courts have even found a substantial discrepancy sufficient to establish a *prima facie* case. [citations omitted]" Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333, 1335 n. 4 (2d Cir. 1973). While the Court of Appeals of this Circuit has not specifically addressed itself to this problem, it has held "Where a history of racial segregation is shown to exist, the burden of showing nondiscrimination is on the party having the power to produce the facts." Rolfe v. County Board of Education of Lincoln County, Tenn., 391 F.2d 77, 80 (6th Cir. 1968).

There is a serious question as to whether the evidence in this case shows a history of segregation. The evidence does show that for a long time there were few minority police officers, and even fewer police command officers in the Toledo Police Department, and that certain physical and educational requirements for membership in the police force, combined with limited efforts to recruit minority members, may have contributed to this. There was also evidence that minority members had for a long time resisted recruiting efforts that were made, and some were still unconvinced that there was any real desire to integrate minority members into the police force. At the time of trial, the proportion of all minority members on the force was about half that in the community, although the proportion of minority members of Spanish-speaking descent was only five-tenths of one percent less on the force than in the community.

■ Givng the plaintiffs the benefit of the doubt, it can hardly be said that the statistics alone are sufficient to establish a prima facie case of racial discrimination. However, when the statistics of racial imbalance. in police command positions are viewed in the light of all the evidence in the case, the Court is satisfied that the plaintiffs have borne the burden of showing that there are discriminatory elements in the promotional system of the Toledo Police Department which must be eliminated in order not to perpetuate the present condition of racial imbalance.

### III. *The Issues of Discrimination*

The problems of discrimination involved in this case, and the methods to be used in resolving them, are extremely complex. They were approached rather simplistically by the parties, which does not particularly ease the difficulties of decision.

Much of the evidence in the case was presented by a series of elaborate stipulations of fact. From these stipulations it appears that at present, the popula-

---

5. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII action).

6. *Id.*; Bridgeport Guardians, *infra* at 1335; Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971).

tion of the City of Toledo, broken down by race, is as follows:

| Total Population (all races) | 384,015 | 100% |
|---|---|---|
| White | 322,356 | 84% |
| Black | 52,925 | 13.8% |
| Persons of Spanish-speaking descent | 7,352 | 1.9% |
| All others* | 1,382 | 0.3% |

The breakdown by race within the Toledo Police Department is:

| White | 720 | 91.8% |
|---|---|---|
| Black | 53 | 6.8% |
| Spanish origin | 11 | 1.4% |

The racial breakdown by rank within the Toledo Police Department is:

| Rank | Total in Rank | White | Black | Spanish Origin |
|---|---|---|---|---|
| Chief | 1 | 1 | | |
| Asst. Chief | 5 | 5 | | |
| Captain | 18 | 18 | | |
| Lieutenant | 39 | 38 | 1 | |
| Sergeant | 80 | 80 | | |
| Patrolman | 621 | 558 | 52 | 11 |

It appears from the evidence that at the time of filing the *Sarabia* case, No. C 72–263, both the standards for membership in the police department, and the competitive examinations for entrance into the police force seemed to have the effect of discriminating against minority members who sought to join the police force. Although that action has not yet been heard and determined, after it was filed, changes in the standards for membership, qualifying examinations, and recruiting practices were made which have resulted in a substantial increase in the number of minority members of the police force.

A civil service promotional examination was given on April 28, 1973. The last previous test was given exactly two years earlier. The civil service regulations provide that in order to be eligible to take the examination, an officer has to have served five years as a police officer. The rules also provide for up to ten additional credit points for years of previous service up to fourteen years, at the rate of one point for each of the first four years of service, and six-tenths of a point for each of the next ten years.

The following table shows the numbers and ratios of police officers with respect to the examination:

| | Total | Eligible [7] | % | Applied | % | Rejected | DNA [8] | % |
|---|---|---|---|---|---|---|---|---|
| Total | 622 (100%) | 468 (100%) | (75%) | 331 (100%) | (71%) | 0 | 58 (100%) | (17%) |
| Majority | 558 (90%) | 434 (93%) | (78%) | 307 (93%) | (71%) | 0 | 51 (88%) | (17%) |
| Minority | 64 (10%) | 34 (7%) | (53%) | 24 (7%) | (71%) | 0 | 7 (12%) | (29%) |

| Took Exam | % | Eligible [9] | % | Disqualified [10] | % |
|---|---|---|---|---|---|
| 273 (100%) | (83%) | 231 (100%) | (85%) | 42 (100%) | (15%) |
| 256 (94%) | (83%) | 219 (95%) | (85%) | 37 (88%) | (15%) |
| 17 (6%) | (71%) | 12 (5%) | (71%) | 5 (12%) | (29%) |

7. Qualified to take the examination.
8. Did not appear to take the examination.
9. Qualified to appear on the appointment list.
10. Did not qualify for appointment list.

While these statistics are somewhat confusing, they show that a substantially lower percentage of the minority groups were eligible for the examination. While the minority group makes up 10% of the police force, only 7% of the minority group who were eligible to take the examination applied. Of those who applied, only 17% of the majority group failed to take the examination, while 29% of the minority groups failed to do so. The failure rates of those who took the examination showed a somewhat greater disparity, as only 15% of the majority group failed, while 29% of the minority groups failed.

It very clearly appears that the five year eligibility rule, and to some extent the seniority point credit rule, have a discriminatory effect upon promotion in the police force.[11] It is impossible to find that requiring a long period of service, or giving credit for mere length of service, has any real relationship to the ability to perform in the higher rank. Long periods of service in grade before promotion have been held not to be justified by either business necessity or compelling governmental interest. Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.C. 1973); Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Service Commission, *supra*. The awarding of points for seniority has also been held improperly discriminatory. Allen v. City of Mobile, 331 F.Supp. 1134 (S.D. Ala.1971). Something that is no good to begin with does not get better with age, and an employee who is merely a time-server does not become anything more simply because he succeeds in serving a long time. Seniority systems are the refuge and fortress of mediocrity, and are a handicap to the energetic, industrious, intelligent and capable.

When, in addition, they result in maintaining a system which shows evidence of racial discrimination, they must fall.

■ Assuming that the hiring practices attacked in Civil No. C 72–263, Sarabia v. Duck were in fact discriminatory and have been abandoned, retaining the seniority and time in grade provisions of the civil service rules would tend to perpetuate the racial imbalance that existed while these practices were being engaged in. There is no reason to permit this. The practical effect of these rules is discriminatory, and as a result the rules cannot stand, nor can the results of the examination which was based upon them.

A much more difficult question is whether the promotional examination itself, which was given on April 28, 1973, was unvalidated and culturally biased, resulting in discrimination against the class of plaintiffs because of their race.

Most of the testimony offered at the trial was concerned with these problems, but the difficulties go to fundamental problems of government which were not specifically dealt with.

Article XV, § 10 of the Constitution of the State of Ohio provides that:

"Appointments and promotions in the civil service of the state, the several counties, and cities, shall be made according to merit and fitness, to be ascertained, as far as practicable, by competitive examinations . . . . "

The Charter of the City of Toledo conforms to this constitutional mandate, by providing for appointments in civil service, and creating in Chapter VIII a civil service commission. This Chapter provides for classified and unclassified services, and in the classified service for competitive and non-competitive classes. The competitive classes include all posi-

---

11. These rules freeze the status quo of the prior discriminatory hiring practices of the Toledo Police Department. They benefit only the members of the police force who were selected under these past practices and help to perpetuate the past practices at the command positions. This freezing has been prohibited in cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. by Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973).

tions and employment for which it is practicable to determine the merit and fitness of applicants by competitive tests. (§ 171(2)(a)). The examinations are to be practical and impartial, and are to relate to those matters which will fairly test the relative capacity of the person examined to discharge the duties of the position for which appointment is sought.

■ The ideal of a merit system of public employment, which Constitution and Charter enshrine, is an ancient one. As with home and motherhood, it is unthinkable to traduce civil service. To attack civil service is almost like advocating sin. Unfortunately, as this case beautifully illustrates, a merit system based on competitive examinations is basically and necessarily discriminatory. Ideally, it is supposed to discriminate between competence and incompetence in doing a job. Practically, it can and sometimes does discriminate by maintaining the status quo against any kind of change. The question is which of these two kinds of discrimination, the good or the bad, is involved in this case.

The testimony in this case was, in the main, directed toward attempting to demonstrate that the examination of April 28, 1973, either did, or did not, discriminate among those who took it upon other matters than their ability to perform the work of a line sergeant of police.

The defendants and their experts offered testimony that the test had been carefully drafted to seek out the knowledge of those taking it about the work of the line sergeant. The plaintiffs and their experts offered testimony that no written test could evaluate the ability of a person to perform the most important functions of police command, that this test really tested only the ability to learn and recall text material that had been read and studied, and that any written examination has an unavoidable cutural bias against minority group members.

Large quantities of statistics were quoted and discussed, and many statistical studies were made of the results of the examination, most of them couched in careful double negatives. The overwhelming weight of the statistical evidence leaves no doubt that the number of minority members taking the examination was too small to form a basis for any reliable statistical conclusions. This would include what the plaintiffs stated in closing argument to be the only important statistical conclusion, that one hundred percent of the majority applicants would be promoted, and one hundred percent of the minority applicants would fail to be promoted, thus maintaining, until another eligibility list, a situation in which only one out of one hundred forty-three, or seven-tenths of one percent, of the police command officers were members of a minority group.

It would add length, but not substance, to this opinion, to analyze in detail the testimony and evidence adduced in the several days of this trial. The basic issue still remains: was the examination job related, that is, did it bear a demonstrable relationship to successful performance of the job for which it was used? Several methods may be used to establish job relatedness, which are discussed in detail in the *Bridgeport Guardians* case, *supra*. While the evidence was not helpful upon the basis of "predictive validity," it did show both "construct validity" and "content validity." The evidence in these regards was both conflicting and voluminous, but it leaves no doubt as to the following matters:

FIRST: As far as any written examination can be, this examination was job related. It dealt comprehensively with knowledge that a line sergeant of police must have.

SECOND: No written examination can test the crucial qualities of leadership and ability to make decisions in emergency situations that a police command officer must possess.

However, the evidence did not establish that it is practicable to devise an examination to evaluate simply, quickly, and objectively the important qualities of leadership and proper response to emergencies. Nor was there sufficient evidence to establish the contention that any written examination has a built-in cultural bias against members of minority groups. Not only is this contention an example of the stereotype discrimination conclusion that the courts are supposed to strike down, it also is based on the fiction that one cannot by preparation improve his performance on so-called "objective" tests. Anyone who has paid any real attention to the matters of competitive qualifying examinations is aware that there are quiz courses and materials available to help aspirants to pass or to achieve high scores on such examinations. There is nothing wrong about this, unless one concedes that the whole basic civil service idea of competitive examinations is wrong.

Although it was asserted that racial minorities are accorded unequal cultural and educational opportunities, and thus are handicapped in taking written examinations, there was no proffer of any evidence that this is true of the Toledo school system, or of community life in Toledo. But even if it were conceded that the assertion is true, no evidence was offered that any other kind of competitive examination than the traditional written one can be, or has been, devised, that could not be much more easily manipulated to achieve the very discrimination which is attacked here.

■ It thus appears that, since a new promotional examination must be given, the Court is faced with the alternative of approving a written test basically the same as the one given, or ordering that the new examination be either wholly or partially a performance type examination. The evidence showed that such an examination could possibly be devised and administered, but it did not show that it would be practical to do so, or that such an examination would not involve far too large a proportion of subjective judgment on the part of the examiners.[12]

### IV. *The Lieutenant and Captain Promotions*

The complaint alleges that a captain's eligibility list was established on August 10, 1971, and a lieutenant's list was established on May 17, 1973, the same time that the sergeant's list was. It is further alleged that on August 1, 1973, three captains and three lieutenants were appointed from these lists. There is a prayer for the rescission of these promotions.

No evidence whatever was offered in support of these contentions. Civil Service Rule 50.19 provides that to be eligible for promotion above the rank of sergeant, the applicant must have served two years in the next lower rank. Thus an officer would have to serve two years as sergeant before being eligible to be appointed as a lieutenant, and two years as a lieutenant in order to seek appointment as a captain. Seniority credit is also added to the examination scores in setting up the eligibility lists for these positions.

■■ For the same reason that the service requirements for eligibility to become sergeant were held invalid, the requirements for the higher grades are also invalid. However, there was no showing whatever that this invalidity would have any effect upon the promotions made on August 1, 1973. In the absence of such a showing, there is nothing to authorize the Court to rescind the promotions already made. However, it is obvious that no further promotions can be made from the eligibility lists previously established. The opportunity to take an examination must be offered to all persons eligible for promotion to the ranks higher than ser-

---

12. To allow great latitude on the part of the examiners to exercise subjective judgment would only afford further opportunities for discrimination.

geant, and new eligibility lists must be prepared for future promotions.

## V. *The Question of Laches*

All of the defendants contend that the failure of the plaintiffs to commence this action until August, when the examinations for sergeants and lieutenants were held in late April, and the eligibility lists were prepared in mid-May, and waiting until after appointments had been made or announced, constitutes laches which should bar their action.

The equitable doctrine of laches, however, involves more than just delay. There must also be a showing that the party asserting the bar had changed his position in reliance upon the inaction of the other party, to such an extent that he would suffer some special harm if relief were granted against him.[13]

What evidence there was with respect to this matter does not show that anybody was in any particular hurry to do anything after the eligibility list was prepared. Nothing in the record shows the time when the additional sergeant's positions were authorized. While it might have been better had the plaintiffs acted more promptly, at least so far as the intervening defendants, those officers first in order for the appointments as sergeant, are concerned, it does not appear that the defense of laches is tenable.

The situation is perhaps a little different with respect to the captains and lieutenants who were appointed on August 1, 1973, and who made no effort to intervene in this action. The first attempt by the plaintiffs to bring this action into court occurred on August 2, the day after the appointments were made. At least as to the captains, the plaintiffs should have recognized that prompt action was necessary, since the eligible list would expire on August 9, and the defendants, if they did not appoint them before then to fill the vacancies, would have had to undergo the expense and delay of a new examination.

The Court is satisfied that the equities of the situation are against the plaintiffs on the matter of the appointment of the captains and lieutenants. While no future appointments may be made for those ranks until new examinations have been held and new eligible lists established, the appointments already made will not be disturbed.

## VI. *Relief*

Although the Court has held that the service in grade requirements of Civil Service Rule 50.19 and the seniority credit provision of Civil Service Rule 50.10 have a racially discriminatory effect, and cannot be justified on the basis of either business necessity or compelling governmental interest, it is clear that at least some service in lower rank can properly be considered as a job-related requirement essential for service in a higher rank. The problem is to strike a proper balance between the need for some experience and the perpetuation of the racial imbalance in the police department. The Court accepts Benjamin Franklin's view of the value of experience, and on that basis concludes that no more than one year of service in a lower rank can properly be required as a condition of eligibility to take promotional examinations in the Toledo Police Department for the next higher rank.

Nor is there any justification whatever for giving seniority credit on promotional examinations. Long service in lower ranks tends to show less, not more, ability to perform the work of higher rank. When, as here, seniority credits clearly prolong the time necessary to remedy the existing racial imbalance, they must fall.

Since the examinations for lieutenants and sergeants were given on the basis of invalid restrictions, and the eligibility list for captains has expired, new examinations for those positions shall be held, and a new eligibility list

12. E. g., Johnston v. Thomas, 275 F.Supp. 32 (S.D.Ohio 1967).

for those positions shall be made. All persons with more than one year of service in the next lower rank shall be eligible to take the examinations for promotion, and no seniority credit shall be given.

██ The examinations may be in written form similar to the examination of April 28, 1973. However, in giving the examination, while the defendants may require that the applicants may not leave the examination room until they have completed the examination and surrendered their answer sheets, and may require that all applicants shall be present at a fixed time and start the examination together, no requirement shall be imposed fixing a time limit within which the examination must be completed unless the limit is amply long to give even the slowest applicant time to answer the questions and check his answers, the time allowed limit is clearly and conspicuously written in the instructions, and there are clocks in view to make it easy to check the passage of time. The evidence at the trial was conflicting on the question of a time limit. The defendants' evidence was that no time limit for completing the examination was imposed. The plaintiffs' evidence was that at the end of a fixed time they were forced to turn in the answers, whether or not they had completed them, even though they had not been warned that there was a time limit imposed. The Court finds as to this matter in favor of the plaintiffs, and believes that the defendants' action was unfair and unnecessary. It must not be repeated on future tests.

██ The plaintiffs shall have the right to engage an impartial and professionally qualified expert on the construction and administering of tests of ability to assist the personnel technician of the defendants in the preparation of the examination. No question shall be included upon the examination unless both the personnel technician and the plaintiffs' expert agree that it is a proper question. If as to some particular question or questions they cannot agree, but one or the other feels that the construction of a fair and adequate examination requires the inclusion of the question upon the examination, they may submit such questions with a brief statement of their reasons concerning their inclusion or exclusion to the Court, under seal, for an *in camera* examination and ruling. A reasonable fee for the services of the expert shall be taxed as costs against the defendants.

This Court will retain continuing jurisdiction over this action and the parties until a new examination has been created and given and an appointment list devised from that examination.

This opinion will serve as the Court's findings of fact and conclusions of law. Plaintiffs may prepare and submit an order reflective of these findings and conclusions of law in accordance with the Local Civil Rules.

The stipulation of the parties preventing the appointment of command officers from the eligibility lists of May 17, 1973, will be continued until such time as the order upon these findings shall be placed on file with the Clerk, perpetually enjoining the defendants from making any appointments from such lists.