**JOSEPH SKILLKEN AND COMPA-NY et al., Plaintiffs,**

v.

**CITY OF TOLEDO et al., Defendants.**

**Civ. No. 74–202.**

United States District Court,
N. D. Ohio, W. D.

Aug. 28, 1974.

Theodore M. Rowen, William M. Connelly, Joseph R. Tafelski, Toledo, Ohio, Jay Mulkeen, Washington, D. C., for plaintiffs.

Joseph P. Jordan, John D. Scouten, Toledo, Ohio, for defendants.

## MEMORANDUM

DON J. YOUNG, District Judge.

### I. Introduction

This suit is instituted pursuant to several enactments within Title 42 of the United States Code. The specific sections are 1401 et seq., 1441 et seq., 1981, 1982, 1983, 2000d et seq., and 3601 et seq. The action is also based upon the Thirteenth and Fourteenth Amendments to the United States Constitution. The jurisdiction of this Court is founded upon 28 U.S.C. § 1331 and § 1343; 42 U.S.C. § 3612 and § 3617. The plaintiffs are: Joseph Skillken Company (hereinafter Skillken) a corporation en-

gaged in the development and construction of residential dwelling units; Toledo Metropolitan Housing Authority (hereinafter TMHA); and low income minority persons on behalf of themselves and all other low-income minority residents who seek the opportunity to live in decent, safe, and sanitary housing in the City of Toledo, outside areas of minority concentration.[1] There are numerous defendants in this lawsuit and they appear as follows: The City of Toledo (hereinafter City), a body corporate and politic, established and organized under the laws of the State of Ohio; Mayor Kessler, duly elected Mayor of the City of Toledo and as such the Chief Executive Officer of the City and a member of the Council of the City; Defendants Cook, Copeland, Daoust, Douglas, Galvin, Nies, Pietrykowski and Reddish, the duly elected Council members of the City of Toledo; Defendant Toledo City Plan Commission (hereinafter Commission), a commission established and organized under the laws of the State of Ohio, § 3735.27 et seq. Ohio Rev.Code, and the City of Toledo. The Commission's duties include the responsibility to review requests for rezoning and platting and to ensure their compliance with the Toledo zoning ordinances and subdivision regulations. Defendants Burke, Cooke, Martin, Schimmel and Stoepler, are members of the Commission appointed pursuant to the laws of the State of Ohio and the City of Toledo.

## II. Background

On August 12, 1968 the City and TMHA entered into a Cooperation Agreement which provides in paragraph nine:

So long as any contract between the Local Authority and HUD for loans, (including preliminary loans) or both in connection with any Project remains in force and effect, or so long as any bonds issued in connection with any Project or any monies due to HUD in connection with any Project remain unpaid, this Agreement shall not be abrogated, changed, or modified without the consent of HUD. The privileges and obligations of the Municipality hereunder shall remain in full force and effect with respect to each project so long as the beneficial title to such Project is held by the Local Authority or by any public body or governmental agency, including HUD, authorized by law to engage in the development or administration of low-rent housing projects. If at any time the beneficial title to, or possession of, any Project is held by such other public body or governmental agency, including HUD, the provisions hereof shall inure to the benefit of any may be enforced by, such body or governmental agency, including HUD.

Furthermore, the agreement contains no provision which can be construed to give the City power to approve or disapprove sites selected for low-rent housing projects by TMHA. To meet its obligations under the Cooperation Agreement, TMHA sought and received a reservation of funds from HUD for the construction of 150 single family housing units under the Turnkey III Program.[2] Accordingly, TMHA advertised for proposals on the 150 units and Skillken responded to the advertisement by submitting a proposal to TMHA for the construction of 140 units of single family housing. Skillken's proposal was accepted by TMHA and a letter designating Skillken as the Turnkey developer was issued by Carl Barrett, Director of TMHA. Thereafter discussions between Skillken, TMHA and the Commission's

---

1. An initial determination was made at a pretrial conference conditionally certifying the action as a class action with the class being tentatively determined as including all low income minority persons residing in the Toledo Metropolitan area who, by virtue of their race and poverty, are unable to secure decent, safe and sanitary housing in the City of Toledo, at rents or prices which they can afford without assistance from the Toledo Metropolitan Housing Authority (T.M.H.A.), and who are eligible for the Turnkey III Housing program.

2. See plaintiffs' exhibit 40.

staff resulted in choosing three sites upon which to build the proposed public housing units. Skillken then entered into option contracts for the acquisition of real property to build: 50 units of public housing on the Heatherdowns Boulevard site (hereinafter Heatherdowns); 46 units of public housing on the Holland-Sylvania Road site (hereinafter Holland-Sylvania); and 34 units of public housing on the Stateline Road-Lewis Avenue site (hereinafter Stateline). In December 1973, Skillken sought approval from the Commission for the preliminary platting of the three proposed sites.[3] Simultaneously, Skillken petitioned the Commission for a rezoning of the Heatherdowns site to permit construction of single-family low-income housing on lots of smaller dimension than the existing zoning provides. This was not required for the Holland-Sylvania and the Stateline sites since the existing zoning accommodated Skillken's proposals. The Commission's staff recommended to the Commission that it approve Skillken's requests with regards to the rezoning of the Heatherdowns site and the preliminary platting for all three sites. On January 24, 1974 the Commission approved the plat for the Holland-Sylvania site. Subsequently it was revealed that Skillken's development was intended for public housing.[4] This led to a series of events which culminated in the commencement of this lawsuit. On March 7, 1974 the Commission rejected Skillken's petitions for the platting of the Stateline and Heatherdowns sites and also for the rezoning of the Heatherdowns site. After reviewing the Commission's action on rezoning the Heatherdowns site, the Toledo City Council preliminarily denied Skillken's request for rezoning on March 19, 1974. On March 21, 1974 the Commission rescinded its earlier approval of the preliminary platting for the Holland-Sylvania site. On March 26, 1974, City Council finally and formally rejected Skillken's request for rezoning of the Heatherdowns site by passage of Resolution 1–74.

The plaintiffs filed this action on May 28, 1974. At the request of the plaintiffs and because of its importance, not only to the parties involved but also to the community, the case was expedited for an early hearing which the Court scheduled for July 15, 1974. The defendants subsequently requested a trial by jury which the plaintiffs opposed. The Court without ruling upon defendant's right to a trial by jury, bifurcated the trial so that the issue of injunctive relief would be heard to the Court without a jury pursuant to Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974).[5] After ruling upon various preliminary matters,[6] the hearing upon plaintiffs' request for declaratory and permanent injunctive relief commenced on July 15, 1974, and continued, with interruptions on July 18, into the morning of July 19, 1974.

3. Technically, the laws make no provisions for preliminary platting approved by the Commission. However, the development of a legal plat is a very complicated and expensive business. A practice has been established by the Commission under which a developer could secure approval for a preliminary plat before going to the expense of preparing a complete plat. Whatever conditions the commission required in order to approve the preliminary plat could then be met in the final plat, and the approval of that plat would be merely a formal matter.

4. The testimony of Mr. Suchan, Deputy Director of the Toledo Lucas County Plan Commission, and Mr. Willard Jacquot, Principal Planner of the Toledo Lucas County Plan Commission did not indicate that there was any subterfuge in not revealing that the proposed sites were for public housing. Rather the Commission's staff believed that their responsibility was to ensure that the proposals would meet the technical requirements for platting and whether the housing was public or private would not play a significant role in making that determination.

5. See Pretrial Order filed July 3, 1974.

6. Among the Court's rulings were denials of motions to intervene filed by both plaintiff-applicants, see Memorandum and Order filed July 1, 1974, and defendant-applicants. See Memorandum and Order filed July 8, 1974.

### III. Housing

The City of Toledo, according to the 1970 census, had a population of 383,818 persons; 329,068, or approximately 86%, were white; 52,915, or approximately 14% were black; and 1,835, or less than 1% were of other minority groups. It quickly became apparent from the testimony of various witnesses and the statistical evidence submitted that the City of Toledo is a racially segregated city with minority groups[7] heavily concentrated in limited sections of the City known as the "Southwest Corridor," or the "Black Corridor".[8] The forces which brought about this segregated housing pattern were many. Among them were a policy of channeling or steering white prospective buyers away from black neighborhoods and black prospective buyers away from white neighborhoods by real estate agents. Blacks also encountered far greater difficulty in obtaining financing for homes than their white counterparts. Unfortunately, the record very clearly shows that these forces are still at work with the effect of creating *de facto* segregation not only in housing but also in the racial composition of the public schools in the City.[9]

Past public housing projects were, until very recently, consistently placed in areas adjacent to already highly concentrated minority housing further adding to the segregated pattern.. TMHA and the Commission's Staff, in an attempt to change that policy and scatter public housing projects throughout the City, cooperated with Skillken in selecting three sites which they believed would accomplish this purpose. The Heatherdowns site,[10] the Stateline site[11] and the Holland-Sylvania[12] site are all located in areas where there is 0–2% minority population. Furthermore the sites would be scattered in distinct sections of the City: Heatherdowns in the southwest corner, Holland-Sylvania in the west and Stateline in the north. The testimony very clearly showed that given the presently existing and quite limited availability of land in the City, the sites could not be scattered more. The records of the hearings before the Commission and the Council are a sad display of bigotry, intolerance, and selfishness at its worst. With a great, but totally hypocritical, show of piety, public officials and neighboring property owners pretended that to develop groups of dwellings would only create new ghettoes and that acceptable minority housing can only be obtained by building or buying individual houses throughout the city, or better still, by going out into the suburbs or rural areas beyond the city. The evidence in this case leaves no doubt that the actions and attitudes which have created segregation in Toledo are so strong and so persistent that only very positive court action can change the

---

7. In referring to minority groups the Court intends to include in this designation such races, creeds and national origins as are normally so indicated including specifically Black Americans, American Indians, Orientals and individuals with Spanish surnames.

8. See plaintiffs' Exhibit 165, a 1970 Toledo Urban Area Census Tract Map, illustrating the racial composition of the City of Toledo; and plaintiffs' Exhibit 170, a "Black" Map illustrating the percent of blacks living in any one block of the City of Toledo.

9. The City of Toledo school system is classified as a "neighborhood school concept." As a result of the segregated housing pattern in the City there is great disparity in the racial composition of both elementary schools, compare Longfellow: Minorities–10, Whites–

1,106 to Lincoln: Minorities–893, Whites–0, and high schools, compare Bowsher: Minorities–50, Whites–1,777 to Scott: Minorities–2,183, Whites–60. See plaintiffs' exhibits 67–69.

10. The high school which serves that area is Maumee High and the racial composition as of 1973 was: Minorities–32, Whites–1,333. Plaintiffs' Exhibit 71.

11. The high school which serves that area is Whitmer High and the racial composition as of 1973 was: Minorities–20; Whites–2,935. Plaintiffs' Exhibit 70.

12. The high school which serves that area is Rogers High and the racial cimposition as of 1973 was Minorities–332, Whites–1,986. Plaintiffs' Exhibit 69.

present housing patterns. The housing that was proposed for these sites would be under HUD's Turnkey III Program, which provides that the public housing be constructed for single-family dwelling units with potential ownership by the resident. The prospective residents would be selected by TMHA from its eligibility lists. Presently 70% of the families living in TMHA family projects are minorities.[13] Furthermore, approximately 70% of the people on the waiting list for Turnkey III housing are minorities and approximately 50% of the total minority population in the City are eligible for public housing.[14] The inescapable conclusion that must be drawn from these statistics is that decisions regarding public housing disproportionately affect minority groups since they comprise the vast majority of people who qualify for such housing.

## IV. Initial Determination of Discrimination

The primary emphasis of the plaintiff's lawsuit is not grounded upon a claim of a denial of a fundamental right to decent housing, Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) or upon a claim of discriminatory treatment engendered by suspect wealth classification, San Antonio v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Instead, the plaintiffs contend that the defendants' decisions to reject the proposed housing sites were racially motivated. This is a serious charge, and one that this Court has grappled with in many forms. See Afro-American Partolmen's League v. Duck, 366 F.Supp. 1095 (N.D.Ohio 1973), aff'd, 503 F.2d 294 (6th Cir., filed Sept. 26, 1974). And although it has been a score of years since the federal judiciary cast aside any doubts that racial discrimination would not be tolerated, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the subtleties that have been refined and developed to perpetuate discriminatory practices require that the judiciary continue to scrutinize all decisions of public or private organizations involving the likelihood of discrimination and intervene positively when necessary to create and promote equality. There can no longer be any question that under our Constitution distinctions in treatment based upon race are inherently suspect. Brown v. Board of Education, supra; McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed. 2d 222 (1964); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

Furthermore, Congress has continued to expand the protection of individual rights by the passage of the Fair Housing Act. As stated at the outset of this legislation, it was enacted to ensure a "policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Similar to the 1866 Civil Rights Act, this legislation passed as Title VIII of the Civil Rights Act of 1968, is a congressional exercise of power under the Thirteenth Amendment to eliminate the badges and incidents of slavery. The United States Supreme Court recognized this by stating, when reviewing an action under 42 U.S.C. § 1982, that:

> [W]hen racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery. Jones v. Mayer Co., 392 U.S. 409, 442–443, 88 S.Ct. 2186, 2205, 20 L.Ed.2d 1189 (1968).

Therefore Title VIII and Civil Rights Act of 1866 together comprehensively spell out the right of an individual to rent or purchase housing without suffering discrimination and to obtain federal enforcement of that fundamental guarantee. Jones, supra. As stated by the United States Court of Appeals for the Eighth Circuit in Williams v. Matthews

13. Plaintiffs' Exhibit 60.

14. Id. and plaintiffs' Exhibit 61.

Co., 499 F.2d 819 (8th Cir. filed June 20, 1974):

> Recent cases make clear that the statutes prohibit all forms of discrimination, sophisticated as well as simple-minded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hinderance, and special treatment must receive short shrift from the courts. *See* United States v. Pelzer Realty Company, Inc., 484 F.2d 438 (5th Cir. 1973); United States v. Youritan Construction Company, 370 F.Supp. 643 (N.D.Cal., filed Feb. 8, 1973); Hall v. Freitas, 343 F.Supp. 1099 (N.D.Cal.1972); Newbern v. Lake Lorelei, Inc., 308 F.Supp. 407 (S.D.Ohio 1968); Brown v. Lo Duca, 307 F.Supp. 102 (E.D.Wis.1969).

> Race is an impermissible factor in real estate transactions under both 42 U.S.C. § 1982 and 42 U.S.C. § 3604 and "cannot be brushed aside because it was neither the sole reason for discrimination nor the total factor of discrimination." Smith v. Sol D. Adler Realty, 436 F.2d 344, 349–350 (7th Cir. 1970). The courts will look beyond the form of a transaction to its substance and proscribe practices which actually or predictively result in racial discrimination irrespective of defendant's motivation. *See* United States v. Grooms, 348 F.Supp. 1130, 1133–1134 (M.D.Fla.1972); United States v. Real Estate Development Corporation, 347 F.Supp. 776, 782 (N.D.Miss.1972); United States v. Reddoch, No. 6541–71–P (S.D.Ala., filed Jan. 1, 1972), aff'd, 467 F.2d 897 (5th Cir. 1972).

On this basis the Court finds that the concept of the "prima facie case" under the Civil Rights Act of 1866 is further augmented by the Fair Housing legislation and applies to discrimination in housing as much as to discrimination in other areas of life.

In reviewing the record in this context the Court finds that in the past recommendations by the Commission's Staff with regards to platting were normally approved.[15] Mr. Cline, member of the Commission since 1937, Chairman since 1941 and at the time the three site proposals were rejected, could not recall any specific incidents when the Commission's Staff recommendations were not approved but seemed to remember it occurring once about 10 to 15 years ago. It is notable that although he had had ample opportunity before the trial to research the records of the Commission he could not offer dates or occasions but only vague recollections. The Court is forced to conclude that there really never were any previous instances of the Commission doing what it did here. The record is also replete with rezoning changes in the Heatherdowns area from R–A to various other residential and commercial uses. The present zoning for this area was frequently referred to as in a "holding status" with rezoning contemplated in the near future. Furthermore when specifically asked if the rescission of the Holland-Sylvania platting would have occurred if the development were not designated for public housing, Mr. Cooke, present Chairman and then member of the Commission, answered: "Probably not. I think that's inescapable. Probably not." [16] When the fact that the majority of people who are presently living in public housing are members of minority races is coupled with the fact that the majority of persons who are eligible and waiting for public housing are also members of minority races, the conclusion that any discussion of public housing has racial overtones is unavoidable. In this light and based upon the overwhelming evidence introduced, the Court finds, notwithstanding the attempts by the City to defend its actions, that the plaintiffs have clearly and convincingly met their burden of establishing a case of racial

---

15. The Commission's Staff recommended approval of the platting of all three sites and also the rezoning of the Heatherdowns site.

16. Defendants Exhibit AY, Deposition of Stratman Cooke at page 63.

discrimination on the part of the City. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); United Farmworkers v. City of Delray Beach, 493 F.2d 799 (5th Cir. 1974); United States v. Pelzer Realty Company, 484 F.2d 438 (5th Cir. 1973); Hawkins v. Town of Shaw, 461 F.2d 1171 (5th Cir. 1972); Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2nd Cir. 1970), cert. denied 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 425 F.2d 1037 (10th Cir. 1970); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972) aff'd in part, rev'd in part 473 F. 2d 910 (6th Cir. 1973).

### V. Justification for Discrimination

■ Once the existence of a racially discriminatory effect is proven, the burden shifts to the defendants to demonstrate that the discrimination was necessary to promote a compelling governmental interest. In re Griffiths, 413 U. S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); McLaughlin v. Florida, *supra*; Loving v. Virginia, *supra*; Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

The City suggests a number of reasons to justify its actions and to meet the "compelling interest" test.

### A. TMHA

The City first argues that the past housing projects that TMHA has supervised or been involved with have proven to be failures. Further, that TMHA has not worked closely with the City or Commission in developing public housing. The Court can take judicial notice of the fact that TMHA-involved projects have encountered difficulties. See Markowitz v. TMHA, Civil No. 70–268 (N. D.Ohio Memorandum filed April 25, 1973). However, the City's mere assertion cannot justify its actions. The City as an equal partner with TMHA is also charged with the responsibility of developing an integrated housing pattern for the community. The Mayor has a direct input with TMHA for he selects the persons who serve as members of TMHA's Board of Directors. No evidence was submitted to show that the City attempted to prod TMHA to become a more effective organization or that TMHA spurned the City's efforts in that direction. Rather, it can only be concluded that if there were a demise of TMHA as a responsible entity, the City idly watched it occur. The evidence submitted does not support the City's contention that TMHA has not worked closely with it. The testimony of the Commission's Staff indicated that there was a close and cooperative working relationship between staffs of both organizations. Further, the failure of TMHA to appear at the Commission's and Council's hearings on the proposals for these sites may be attributed to the fact that neither the Commission nor the Council ever requested members of TMHA to appear. The defendants cannot merely shift the blame to another governmental organization because of that organization's lack of cooperation and efficiency when it is evident that the defendants failed to show any initiative either. There is some indication that the members and employees of TMHA justified their failure to involve themselves in the Commission and City proceedings in this matter because under its reading of the housing laws, all responsibility in this area is imposed upon Skillken. This example of bureaucratic ducking is typical of TMHA's pusillanimous approach to its responsibilities.

### B. Neighborhoods

The Heatherdowns site is presently zoned R–A (20,000 sq. ft. lots). In order that the proposed public housing be constructed at this site a rezoning to R–1 (9,000 sq. ft. lots) or R–2 (6,000 sq. ft. lots) was required. City Council and

the Commission attempted to justify rejecting the proposals on the grounds it was not beneficial for the neighborhood. It appears that specific reference is made to Ragan Woods, a housing development across what will eventually be a four lane divided highway from the proposed site. Ragan Woods is comprised of homes valued in excess of $70,000 and presently zoned R–B. However, the record also shows that this area has been frequently rezoned from the initial R–A to other types of residential and commercial uses.[17] The City's explanation for denial of the rezoning is consequently no real explanation at all when viewed in these terms. At most, it is an excuse and a very poor one. It seems to this Court to be completely illogical to contend that rezoning to other residential and commercial uses can be beneficial to the neighborhood yet the plaintiff's requested rezoning would be harmful, unless it be conceded that having poor or minority persons in the neighborhood is harmful, and may legally be forbidden. As stated in Banks v. Perk, *supra*, 341 F.Supp. at 1180 citing from Dailey v. City of Lawton, 425 F.2d 1037 (10th 1970):

> "[I]f proof of a civil right violation depends on an open statement by an official of intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection." 425 F.2d at 1039. Therefore, in the absence of any supervening necessity or compelling governmental interest, any municipal action or inaction, overt, subtle or concealed, which perpetuates or reasonably could perpetuate discrimination especially in public housing, cannot be tolerated.

A similar "neighborhood" defense is made with regards to the denial of the Stateline site and the recission of the Holland-Sylvania site. Similarly the Court disposes of those defenses for the reasons enunciated above.

## C. Technical Requirements

The defendants argue that the Stateline site proposal was properly rejected because there was evidence of "fill" and that the land is subject to flooding. Mr. Cline supported these contentions by referring to photographs shown to him by Mrs. Burke, a woman who had lived in the area for over fifty years. These photographs showed that there was water on the land at one time. However, according to the testimony of Mr. Huber, a registered professional civil engineer, the land was above flood level. Soil boring tests conducted on the site [18] demonstrated that what little old fill existed was shallow, and the building foundations would rest on undisturbed original soil. From all the evidence there appears to be no engineering reason why the proposed housing development cannot be constructed. No competent fact finder could properly have given any credence to the exaggerated and distorted memories of so unabashedly interested a witness as Mrs. Burke against the scientific evidence which contradicted it. To accept prejudiced lay testimony as showing an absence of compliance with technical requirements is so patently a subterfuge as to be totally unacceptable.

## D. Clustered Housing

The City also argued that clustered housing may be fine theoretically but is lacking in a practical sense. Since the three proposed developments consist of small groupings of houses, the City submits it properly rejected them. Such an argument completely overlooks that clustered housing developments are not only rampant throughout the Toledo Community but throughout the United States. To contend that these proposals were properly rejected because they are clustered housing when over the years the Commission and the City have dutifully approved platting and rezoning for other clustered housing developments in every section of the city, is nonsensical. For

---

17. Plaintiffs' Exhibits 85–103.

18. Plaintiffs' Exhibits 15–18.

what distinguishes the Skillken proposed clustered housing from the already existing clustered housing developments other than the potential residents? This argument is particularly offensive when it is applied to the Heatherdowns site. Is Ragan Woods any less clustered because the lots and the prices are twice as big as Skillken proposes? The appalling cluster of the adjacent Southwyck development, shown on the exhibits in evidence, totally demolishes this argument.

### E.  Justification Lacking

In the instant case, as in the *Lackawanna* case, the plaintiffs seek "to exercise their constitutional right of 'freedom from discrimination by the States in the enjoyment of property rights.' Shelley v. Kraemer, 334 U.S. 1, 20, 68 S.Ct. 836, 845, 92 L.Ed. 1161 (1948). The effect of the [City's] action is inescapably adverse to the enjoyment of this right. In such circumstances the City must show a compelling governmental interest in order to overcome a finding of unconstitutionality." *Lackawanna, supra,* 436 F.2d at 114.

■ After a complete review of the record, the Court cannot find that the City has even come close to meeting its burden. The justifications the City tenders are devoid of the requisite "compelling" nature. When viewed in the light of past practices of the City they lack merit and are transfigured into vain, albeit subtle, attempts to veil racially motivated decisions. The Court cannot be swayed by what the City articulates [19] when the effect of its decisions are discriminatory. The Constitution does not permit, and therefore this Court cannot permit, unjustified racial discrimination.

### VI.  Mahaley

The defendants at numerous junctures argued that the instant case is governed by the holding of Mahaley v. Cuyahoga Metropolitan Housing Authority, 500 F. 2d 1087 (6th Cir. filed July 9, 1974). This Court finds it clearly distinguishable. In *Mahaley* the Court of Appeals was asked to decide if a constitutional violation resulted when neighboring municipalities did not enter into cooperation agreements with the local housing authority and refused to consent to the construction of public housing units within their boundaries. The Court of Appeals held there was not a constitutional violation because the decision to enter into a Cooperation Agreement was within the discretion of the municipality. In the instant case, the City has previously entered into a cooperation agreement with the local housing authority (TMHA).[20] Further, this Court has found that the discriminatory housing pattern which has evolved in the City resulted from a prior pattern of discrimination and also that the City's actions fall more heavily upon minority group members than upon the population as a whole. *See* Citizens Comm. for Faraday Wood v. Lindsay, 362 F.Supp. 651 (S.D.N.Y.1973). Although this Court is aware of the *Mahaley* admonitions, it does not find the *Mahaley* holding to be controlling upon the case before it.

### VII.  Conclusion

The Court is cognizant of the complex emotional problems that a case such as this presents. Appropriately, it reiterates the oft quoted words of Justice Day, writing for a unanimous Court, in

---

19. Mr. Wayman Palmer, Acting Director of the Department of Community Development, testified in reference to plaintiffs' Exhibits 81–83, that the City in applying for financial grants from HUD indicated that 150 housing units were scheduled for construction to provide homes for displaced persons. The Skillken housing developments were included within the 150 anticipated housing units. This creates a situation whereby the City seeks funds for construction of public housing and then turns around and rejects the proposals of the developer which would implement its stated policy.

20. This Court has previously held when asked to review the Cooperation Agreement that it is binding upon the City. *See* Davis. v. City of Toledo, Civil No. 70–157 (N.D. Ohio filed June 8, 1970).

Buchanan v. Warley, 245 U.S. 60, 80–81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917):

> That there exists a serious and difficult problem arising from a feeling of race hostility which the law is powerless to control, and to which it must give a measure of consideration, may be freely admitted. But its solution cannot be promoted by depriving citizens of their constitutional rights and privileges.

The evidence in this case demonstrates that this Court's conditional certifying of this matter as a class action was correct. Therefore, this action shall proceed as a class action, and the class of plaintiffs is hereby certified as including all low income minority persons residing in the Toledo Metropolitan area who, by virtue of their race and poverty, are unable to secure decent, safe and sanitary housing in the City of Toledo, at rents or prices which they can afford without assistance from the Toledo Metropolitan Housing Authority (T.M.H.A.), and who are eligible for the Turnkey III Housing Program.

The named plaintiffs are members of this class, and they have more than adequately represented the other members of the class.

As to this portion of the case, the Court finds that Resolution 1–74 passed by the Toledo City Council on March 26, 1974, and the actions taken by the Toledo City Plan Commission in disapproving the rezoning of the Heatherdowns Boulevard site, and the platting of the Holland-Sylvania Road, Stateline Road-Lewis Avenue, and Heatherdowns Boulevard sites are void and unenforceable.

The Court further finds that the plaintiffs are entitled to a permanent injunction restraining the defendants, their officers, agents, and employees, and any and all other persons acting in concert or participation with them:

(1) From enforcing Resolution 1–74 passed by the Toledo City Council on March 26, 1974, and the actions of the Toledo City Plan Commission in disapproving the rezoning and platting of the Heatherdowns Blvd., Holland-Sylvania Road, and Stateline Road-Lewis Avenue sites;

(2) From failing to take all necessary steps to approve Skillken's request for platting approval on the Heatherdowns Blvd., Holland-Sylvania Road, and Stateline Road-Lewis Avenue sites, and for rezoning the Heatherdowns Blvd. site;

(3) From engaging in any acts or practices which have the purpose or effect of denying equal housing opportunities because of race, color, religion, or national origin, or of interfering with the implementation and execution of federal housing programs, or of breaching the August 12, 1968 Cooperation Agreement; and

(4) From expending, or borrowing on any monies allocated to defendants City of Toledo or Toledo City Plan Commission by the U. S. Department of Housing and Urban Development, except for those funds directly related to hardship acquisitions and to the immediate rehabilitation and expansion of the low and moderate income housing supply in the City of Toledo until defendant have complied with (1), (2) and (3) above;

The Court further finds that the issues decided in this case involve controlling questions of law as to which there are substantial grounds for difference of opinion and an immediate appeal would advance the ultimate termination of this litigation. Therefore the Court will permit an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

This matter is continued to a date to be fixed by the Court for a determination of the issue of damages for the plaintiff Skillken, and of the question of the request of the defendants to a jury trial upon this issue.

This memorandum will serve as the Court's findings of fact and conclusions of law. Plaintiffs may prepare and submit an order reflective of these findings and conclusions in accordance with the Local Civil Rules.